UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:                                                                  CASE NO.: 20-14372 MAM

ROBERT J. MOCKOVIAK AND                                Chapter 11
SANDRA H. MOCKOVIAK

    Debtors.
_____/

### LQD BUSINESS FINANCE, LLC'S MOTION TO RESTRICT DEBTORS' USE OF CASH COLLATERAL

A.    Cash is one of the most easily dissipated and untraceable forms of collateral. It is because of the liquid nature of cash collateral that Congress has placed limitations on a debtor in possession's use of cash.[1] See 11 U.S.C. § 363(c)(2). In this case, the Court should prohibit the Debtors from using any cash, other than a limited amount needed to purchase necessary staples (e.g., food) over the next two weeks.

B.    As discussed below in greater detail, LQD Business Finance, LLC ("LQD"), has an interest in the Debtors' cash as a result of LQD's blanket consensual lien upon all of the Debtors' assets, and its judgment lien and its garnishment/citation lien on the cash at Bank of America (and other financial institutions).

C.    LQD is seeking to substantially curtail the Debtors use of LQD's cash collateral because they lack the requisite honesty and trustworthiness to use any amount of cash in this case, other than a limited amount to keep food on their table.

D.    Although information remains to be gathered through discovery, the available

---

[1] The Debtors in possession are seeking to use cash collateral must provide creditors with at least 14 days' notice of a hearing on such request, although a hearing may be conducted on an emergency basis to authorize a limited use of cash necessary to prevent irreparable harm.

evidence thus far indicates that the Debtors are unable to account for approximately $4 million of cash belonging to their closely held business, Clinical Professionals, Inc. ("CPI"). At least $3.4 million of this amount originates from a fraud the Debtors perpetrated upon LQD when they submitted fake borrowing base certificates to LQD to conceal their diversion of approximately $3.4 million of cash away from a Lockbox account. The Debtors were engaging in this dishonest and fraudulent conduct at or around the time that CPI was not paying its employees or its vendors, and at the time that the Debtors were leading a lifestyle far beyond their means. Although the Debtors were earning close to $1 million a year from CPI, that was far from sufficient to sustain 4 high-end homes throughout the U.S., including a sprawling horse farm in Pennsylvania.

    E.    In support of its motion, LQD states as follows:

## PRELIMINARY STATEMENT

    1.    The Debtors filed for relief under Chapter 11 of title 11, United States Code (11 U.S.C.§§ 101, et seq., the "Bankruptcy Code") on April 10, 2020.

    2.    As of the date of the filing of this Motion, the Debtors are in possession of their property and have the duties and responsibilities of debtors in possession pursuant to 11 U.S.C. § 1108.

    3.    LQD files this motion without prejudice to its right to (a) seek the appointment of a chapter 11 trustee under 11 U.S.C.§1103, (b) move under 11 U.S.C. § 1112 to dismiss this case or to convert it to chapter 7 on the grounds, among other things, that the Debtors have engaged in fraud and gross misconduct and filed for bankruptcy relief in bad faith, as discussed below.

    4.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334(b).

5. This matter is a core proceeding under 11 U.S.C. §157(b)(2).

6. Venue of this Bankruptcy Case is proper pursuant to 28 U.S.C. §§1408 and 1409.

## BACKGROUND FACTS

7. On or about August 23, 2019, the Debtors, along with CPI[2] jointly and severally entered into a revolving loan agreement in the aggregate principal amount of $5,250,000.00 and a term loan agreement in the aggregate principal amount of $1,500,000. True and accurate copies of the revolving loan agreement ("Loan 5000403") and the term loan agreement (500404) are attached as **Exhibits "A" and "B"**, respectively, and will hereinafter collectively be referred to as the "Loan Agreements."

8. Pursuant to Section 9 of the Loan Agreements, the Debtors and CPI (collectively, the "Borrowers") granted LQD a security interest in all of their assets including and all products and proceeds thereof, as well as deposit accounts (collectively, the "Collateral") to secure the obligations under the Loan Agreements, (the "Security Interest"). The Security Interest refers to LQD as the "Agent" and defines the Collateral as follows:

> all of such Borrower's assets of every kind and nature, personal property of every kind and nature, and real property of every kind and nature, including without limitation, all Real Property, Personal Property, Cash, Cash Equivalents, Money, Deposit Accounts, Received Payments, Eligible Receivables), Accounts, Accounts Receivable, General Intangibles, Payment Intangibles, Copyrights, Patents, Trademarks, Records, Goods, Inventory, Equipment, Fixtures, Instruments, Securities Accounts, Financial Assets, Investment Property, Certificates of Deposit, Contracts, Documents, Documents of Title, Commercial Tort Claims, Tort Claims, Contract Claims, Health-Care Insurance Receivables, Chattel Paper, Supporting Obligations, Letter-of-Credit Rights, ownership interests in any entity or business, Securities, and Marketable Securities, (ii) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing, and (iii) all payments on or

---

[2] The Debtors collectively or individually hold 85% of the shares of CPI.

under and all products and proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all cash and non-cash Proceeds, and other property consisting of, arising from or relating to all or any part of any of the foregoing, in the case of each of the foregoing, whether now owned or existing or hereafter created, acquired, or arising (all of the foregoing, collectively, the "Collateral"). The Borrowers acknowledge and agree that the lien and security interest granted hereunder is and shall be a continuing first priority lien on and security interest in all of the Collateral to secure all Obligations and all other obligations owed by either Borrower at any time and from time to time to the Agent or any Lender, whether now existing or hereafter arising, absolute or contingent, due or to become due. The Borrowers authorize the Agent to file and/or record such further instruments, financing statements, agreements or undertakings, and such certificates of title, financing and continuation statements. and other instruments as the Agent may deem necessary or desirable to perfect, protect and preserve the first priority security interest hereby granted. Such financing statements may describe the Collateral in the same manner as described herein or may contain a general description such as "all real and personal property and other assets of whatever kind or nature, whether now owned or existing or hereafter created, acquired or arising" or any similar type of description…

9. LQD filed financing statements perfecting its security interest in the Collateral. True and correct copies of such financing statements are attached hereto as **Exhibit "C."**

10. In addition to the foregoing, on or about February 12, 2020, LQD served the Citation to Discover Assets appended hereto as **Exhibit "D"** upon Bank of America, as part of LQD's judgment enforcement efforts against the Debtors. Under Illinois law, the service of a Citation to Discover Assets upon a third party operates as lien upon any and all assets of the judgment debtor in the possession of the third party. *See* 735 ILCS 5/2-1402.

11. Accordingly, pursuant to its Security Interest and its judgment lien and the Citation to Discover Assets, LQD holds a lien on all cash, cash equivalents, accounts and

all other "cash collateral" of the Debtors, as that term is defined within Section 363(a) of the Bankruptcy Code.

12. Section 6 of Loan 5000403 requires that:

> Payment made by any Borrower's obligors on the Receivables shall be remitted only to the Agent's lockbox account (the "Lockbox Account"), as directed below. Borrowers shall direct, in a form and manner acceptable to Lender in Lender's sole discretion, all of each Borrower's obligors to direct payments of Receivables to the Lockbox Account. *Id.*

13. Section 6 of Loan 5000403 further requires that:

> In the event any payment with respect to a Receivable is remitted directly to the Borrowers (or either of them) and not directly to the Lockbox Account as required under this Agreement, the Borrowers shall send, by wire transfer, the amount of such payment to the Lockbox Account on or prior to the business day following the date of such receipt (in immediately available funds). *Id.*

14. Notwithstanding the obligation to deposit all cash into the Lockbox Account, between September 3, 2019 and January 10, 2020, the Debtors caused CPI to divert at least $3,416,000 from the collection of accounts receivable to undetermined purposes. A true and correct ledger of bank activity is attached hereto as **Exhibit "E."**

15. Presumably to conceal their diversion of more $3.4 million, the Debtors caused CPI to submit a borrowing base certificate to LQD that falsely reported, among other things, the amount of eligible receivables that could be used to obtain an advance from LQD. Specifically, on or about January 14, 2020, at the Debtors' direction, CPI submitted to LQD a so-called "Maximum Advance Certificate" for the month ending December 31, 2019, which inflated the amount of Eligible Receivables by more than $3.4 million (the "December MAC", a true and accurate copy of which is attached hereto as **Exhibit "F."**)

16. In addition to the above, on January 6, 2020, the Debtors caused CPI to take

out a secured Merchant Cash Advance of approximately $500,000, even though Section 13(h) of the Loan Agreements expressly prohibited them from doing so. A true and correct copy is attached hereto as **Exhibit "G."**

17. The use and disposition of the more than $3.4 million diverted from LQD and the $500,000 obtained from the Merchant Cash Advance is not known at this time.  What is apparent, however, is that the Debtors starved CPI of cash to such an extent that it failed to pay its employees since the beginning of 2020.  The total amount owed to employees may be as high as $1 million.

18. In addition to the above, the Debtors used the CPI business account as a personal "piggy-bank" to fund their lavish lifestyle at the expense of CPI and LQD, regularly making cash withdrawals in violation of the Loan Agreement.  *See Exhibit E*.  Just by way of example, the Debtor's List of Twenty Largest Creditors [D.E. #3] reflect an obligation of close to $1 million to Ferrari Finance for a single automobile (which they returned at some point).  The same List also reflects more than $100,000 owed to Neiman Marcus and another $78,000 to Saks Fifth Avenue.  Once the Schedules are filed, they will reflect that the Debtors own four expensive residences, including a large horse farm in Pennsylvania.

19. Once LQD discovered the Debtors had been submitting materially false financial information, LQD commenced trying to implement a work out.  To this end, LQD and the Debtors, along with CPI, entered into a Forbearance Agreement on or about February 7, 2020 (the "Forbearance", a true and correct copy is attached hereto as **Exhibit "H."**)

20. The Forbearance Agreement was actively negotiated over the course of several weeks.  During that time, the Debtors were represented and advised by Greenberg Traurig, LLP, a large nationally recognized law firm. Among other things, through the

Forbearance Agreement, the Debtors reaffirmed and ratified all of their Obligations to LQD, acknowledged that LQD had a perfected and first priority security interest in all of their assets and waived and released any and all claims against LQD. *See Exhibit H.*

21. The Debtors also acknowledged through the Forbearance Agreement that they had "defaulted under the Loan Agreements by incurring secured debt outside the ordinary course of their business without the prior written consent of Lender; by receiving not less than Three-Million Four-Hundred and Sixteen Thousand Dollars and 00/100 Cents ($3,416,000.00) from account debtors and failing to forward such funds to the Lockbox Account; and by submitting to Lender on or about January 14, 2020, Maximum Advance Certificates that contain inaccuracies regarding the amount of Eligible Receivables, all in violation of, among other provisions, Sections 10, 13(g), (h), (i) and (j) of the Loan Agreements." *Id.*

22. LQD's obligation to forbear from exercising its rights under the Forbearance was conditioned upon, among other things, the Debtors (i) delivering to LQD mortgages or deeds of trust upon each parcel of Real Property Borrowers owned, (ii) providing an asset and liability report to LQD, and (iii) providing copies of all insurance policies that covered their property. *Id. Section 4.*

23. True to form, the Debtors stonewalled in providing LQD with an asset and liability report, with mortgages on their residences, with insurance policies that would show the coverage on their property and with a stock pledge.

24. Based on these facts, LQD objects to the Debtors' use of LQD cash collateral. LQD does not consent to the Debtors' use of LQD cash collateral as the Debtors cannot adequately protect LQD's interest if they remain as debtors-in-possession. The Debtors have a demonstrated history of putting their interests of ahead of meeting their

obligations to LQD and other creditors; thus, they cannot be trusted, even with the oversight available in bankruptcy, to manage their financial affairs any differently now. Accordingly, as fully explained below, LQD requests that the Court prohibit the Debtors from using LQD cash collateral.

## **LEGAL ARGUMENT**

### **Debtor Cannot Provide Adequate Protection to use LQD's Cash.**

25. Section 363(c)(2) of the Bankruptcy Code states that the Debtor may not use, sell or lease cash collateral unless:

> (A) each entity that has an interest in the cash collateral consents; or
>
> (B) the court, after notice and hearing, authorizes such use in accordance with the provisions [of Section 363 of the Bankruptcy Code]. 11 U.S.C. §363(c)(2).

26. Cash collateral includes "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . ." 11 U.S.C. §363(a). Section 363 does not require that a creditor actually own the property for it to constitute cash collateral; "the section expressly defines cash collateral as property in which a creditor has an interest, including a valid security interest." *In re Foxcroft Square Co.,* 178 B.R. 659, 664 (E.D. Pa. 1995).

27. The Debtor's use of the Cash Collateral, "absent adequate protection, would clearly cause a decrease in the value of that creditor's property in which the debtor had an interest, and would constitute an improper taking of the secured creditor's collateral." *In re 680 Fifth Avenue Assocs.*,154 B.R. 38, 43 (Bankr. S.D.N.Y. 1993); *see also In re Sunnymeade Shopping Ctr. Co.*, 178 B.R. 809, 814 (9th Cir. B.A.P. 1995) ("A court's

authorization for use of cash collateral must adequately protect the creditor's interest in that collateral.").

28. Section 363 further states that the Court "*shall* prohibit or condition such use [of cash collateral] . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e) (emphasis added). Because Cash Collateral, once spent, is impossible to recover, the Bankruptcy Code strictly conditions a debtor's use of Cash Collateral upon the secured creditor receiving adequate protection of its interest in such collateral. The requirement of adequate protection under section 363(e) is mandatory, and if the adequate protection cannot be provided, then the use of the Cash Collateral cannot be allowed. *See e.g., Martin v. Commodity Credit Corp.*, 761 F.2d 472, 475 (8th Cir. 1985) (citing 11 U.S.C. § 363(e)).

29. In light of the Debtors behavior individually and as agents of CPI, LQD has grave concerns about the Debtors' use of its Cash Collateral.

30. LQD is entitled to adequate protection of its interests in the Cash Collateral and Collateral pursuant to Sections 361 and 363 of the Bankruptcy Code. LQD has fully perfected, security interests in the Collateral, including without limitation, all cash, cash equivalents, money, deposit accounts, accounts, accounts receivable, general intangibles and all other real and personal property of the Debtors.

31. Moreover, since LQD already has fully perfected security interests in the Collateral, a replacement lien on LQD interest in the Collateral without any cash payments does not provide adequate protection of LQD interest. *See In re Buttermilk Town Center, LLC*, 442 B.R. 558 (6th Cir. B.A.P. 2010) (holding that replacement lien in collateral alone does not adequately protect creditor where creditor already has security interest in collateral); *cf. In re Waste Conversion Techs.*, 205 B.R. 1004 (D. Conn. 1997) (holding that

unperfected lien on cash collateral did not provide adequate protection of creditor's interest)

32. The Debtors bear the burden of establishing that LQD's interests in the Cash Collateral will be adequately protected. *See* 11 U.S.C. § 363(p) (debtor has burden of proof on "issue of adequate protection"); *see also In re Century Investment Fund VIII L.P.,* 155 B.R. 1002 (Bankr. E.D. Wis. 1989), *aff'd,* 937 F.2d 371 (7th Cir. 1991); *In re Philadelphia Consumer Discount Co.,* 37 B.R. 946, 949 (E.D. Pa. 1984) (debtor had the burden to show that its proposed use of collateral would adequately protect the creditor's interest in collateral); *In re Development, Inc.,* 36 B.R. 998, 1006 (Bankr. D. Hawaii 1984) (burden was upon debtor to establish that creditor's interest in property was adequately protected); *In re 5877 Poplar, L.P.,* 268 B.R. 140, 145 (Bankr. W.D. Tenn. 2001); *In re JKJ Chevrolet, Inc.,* 190 B.R. 542, 547 (Bankr. E.D. Va. 1995), *aff'd,* 117 F.3d 1413 (4th Cir. 1997); *In re Colonial Center, Inc.,* 156 B.R. 452, 463 (Bankr. E.D. Pa. 1993); *Matter of The Cropper Co.,* 35 B.R. 625, 633 (Bankr. M.D. Ga. 1983); *In re Sheehan,* 38 B.R. 859, 863-864 (Bankr. D.S.D. 1984).

33. The Debtors cannot be trusted to adequately protect the interest of LQD as they have historically demonstrated a blatant disregard of any agreements they previously made with LQD. In determining whether a creditor is adequately protected, this Court may look at the pre-petition conduct of the Debtors. *In re Colonial Ctr., Inc.*, 156 B.R. 452, 463 (Bankr. E.D. Pa. 1993). Here, the Debtors consistent behavior of failing to meet their obligations to LQD under the Loan Documents and Forbearance Agreement show conduct unbefitting to a debtor wh is before this Court in good faith. The Debtors have used the CPI business accounts as their personal piggy bank to fund their lavish lifestyle, including the purchase of multiple homes, expensive cars and extensive travel. They have

misdirected and diverted funds belonging to LQD to meet their personal lifestyle needs, while blatantly disregarding all obligations. In fact, one can argue that they used the funds provided to them by LQD under the Loan Agreements to fund their expensive needs and taste.

34. Based upon the circumstances described above, LQD does not consent to the Debtor's use of the Cash Collateral. Based on the Debtors' inability to provide LQD with sufficient adequate protection of its interest in the Cash Collateral, including but without limitation, regular debt service payments, sufficient accounting of the Cash and Cash Collateral, and financial statements concerning their income and disbursements, grounds do not exist for the Court to permit the Debtor's use of the Cash Collateral.

### Additional Protection of LQD Interest.

35. While "adequate protection" may be a flexible concept, this flexibility cannot operate to the detriment of the secured creditor. *See In re Martin,* 761 F.2d 472, 477 (8th Cir. 1985). Regardless of the form that adequate protection takes, a secured creditor is entitled to receive the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(3); *see In re Metromedia Fiber Network, Inc.,* 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) (adequate protection is mandatory); *In re Leavell,* 56 B.R. 11, 13 (Bankr. S.D. Ill. 1985) (same).

36. Even if this Court determines that LQD interest is adequately protected to permit Debtor's use of the Cash Collateral, which it is not, the Court should condition Debtor's use of any Cash Collateral on terms and conditions that fully protect LQD interest in the Cash, including without limitation:

    a. Debtor should be authorized to use the Cash Collateral only in accordance with the terms and conditions of a budget approved by LQD (the "Budget").

b.  The Budget should provide that Debtor's expenses under any category in the Budget should not exceed the figure budgeted by Debtor and agreed by LQD for that category by more than five percent (5%).

c.  The Budget should include all amounts payable pursuant to 28 U.S.C § 1930(a)(6) and administrative expenses of the kind specified in 11 U.S.C. § 503(b) incurred in the ordinary course of the Debtor's business.

d.  By the fifteenth (15th) of each month, the Debtor should provide LQD with a report comparing the "actual" expenses incurred for each line item in the budget compared to the budget approved by this Court;

e.  As adequate protection for use of the Cash, LQD should be provided with continuing liens and security interests under the terms and conditions of the Loan Documents and in all Collateral; and

f.  a replacement perfected security interest pursuant to Section 361(2) of the Bankruptcy Code in all Collateral generated after the Petition Date

g.  As adequate protection for the use of the Cash Collateral, Debtor should be required to pay to LQD a monthly adequate protection payment either agreed to be the parties or as determined by this Court (the "Adequate Protection Payments"). The Debtors should include payment of the Adequate Protection Payments in the Budget; and

h.  Since LQD has a lien on all assets of the the Debtors as borrowers under the loan documents, the Debtors should not be allowed to transfer, dissipate, sell, encumber or otherwise alienate any asset without Court approval after the filing of a Motion and a hearing on said Motion.

37. Absent protections along the lines set forth above, LQD's interest in the Cash

Collateral is not adequately protected and the use thereof should be prohibited.

WHEREFORE, LQD Business Finance, LLC respectfully requests that the Court enter an Order prohibiting the Debtors from using the Cash Collateral or, in the alternative, LQD requests that the Court condition the use of the Cash Collateral on the terms and conditions set forth herein as well as other such relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A) and that a true and correct copy of the foregoing was furnished via U. S. Mail to the parties on the attached mail list this 29th day of April 2020.

KELLEY, FULTON & KAPLAN, P.L.
Attorneys for Creditor
1665 Palm Beach Lakes Boulevard
The Forum- Suite 1000
West Palm Beach, Florida  33401
Telephone: (561) 491-1200
Facsimile: (561) 684-3773

By:  /s/ Craig I. Kelley
       Craig I. Kelley, Esq.
       Florida Bar No.: 782203

**Mailing Information for Case 20-14372-MAM**

**Electronic Mail Notice List**
The following is the list of parties who are currently on the list to receive email notice/service for this case.

**Stefan Beuge**     flsd.bankruptcy@phelanhallinan.com, Stefan.Beuge@phelanhallinan.com
**Carmen Contreras-Martinez**     carmen.contreras-martinez@saul.com, aida.mclaughlin@saul.com;mia-ctdocs@saul.com
**Dana L Kaplan**     dana@kelleylawoffice.com, tina@kelleylawoffice.com;cassandra@kelleylawoffice.com;kristina@kelleylawoffice.com;debbie@kelleylawoffice.com;craig@kelleylawoffice.com
**Craig I Kelley**     craig@kelleylawoffice.com, tina@kelleylawoffice.com;cassandra@kelleylawoffice.com;kristina@kelleylawoffice.com;debbie@kelleylawoffice.com;dana@kelleylawoffice.com
**Office of the US Trustee**     USTPRegion21.MM.ECF@usdoj.gov

**Luis Salazar**   Luis@Salazar.Law, Ceide@salazar.law;Lee-Sin@Salazar.Law;Rivera@Salazar.Law

**Wendy J Wasserman**   wwasserman@mlg-defaultlaw.com, mlgfl-bk@mlg-defaultlaw.com;ecf@mlg-defaultlaw.com

**Manual Notice List**

The following is the list of <u>parties</u> who are not on the list to receive email notice/service for this case (who therefore require manual noticing/service). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

BMW Financial Services NA, LLC, c/o AIS Portfolio Services, LP
4515 N Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118

Harry J. Giacometti
1835 Market St #1050
Philadelphia, PA 19103

Damien Nicholas Tancredi
1835 Market St #1050
Philadelphia, PA 19103

Steven D. Usdin
1835 Market St #1050
Philadelphia, PA 19103

Robert J. Mockoviak
9968 Equus Circle
Boynton Beach, FL 33472

Sandra H. Mockoviak
9968 Equus Circle
Boynton Beach, FL 33472